All right, our next case is Johnston v. ConAgra Foods. For the appellant, we have Mr. Weaver, and for the athlete, Mr. McDonald. Good morning, gentlemen. Good morning. Okay, I can begin, and I can be brief on this because, frankly, the main issue is I think the court erred in granting the summary judgment in favor of the defendants in this cause, and I'm just going to explain to you why I think it was wrong. It was wrong because, one, she did eat peanut butter that was subject to the recall for salmonella poisoning. She had it. She had two jars completely empty of peanut butter that was part of the recall. And then they had been washed out, though, right? So they couldn't be tested, right? Exactly. So there was nothing left to test in regards to those two jars. Now, the third jar that she had, she'd eaten a portion of it, and we provided that to the defendant who tested it and found that it did not contain salmonella, which was good. I mean, I think that's a good thing. Hopefully, you know, you didn't sneak through the cracks, but obviously she subjected herself to peanut butter that could have been contaminated. So, the end result being is that she becomes ill and that she has all the classic symptoms of salmonella poisoning. The diarrhea, nausea, the cramping, all these things are directly part of anybody that has ever treated a salmonella case knows to be out there. I mean, those are the kind of symptoms you have whenever you have salmonella. I know from personal experience, because I got poisoned in a Mexican restaurant once. But to make this long story shorter, she did not know at the time that she first saw the physician that she had been eating bad peanut butter, or could have been eating bad peanut butter. And so, she just says, you know, she thought she had the clue, and then, you know, she explained to him the diarrhea and all the other symptoms, and the doctor gave her something, and then she goes for a period of time. Here's the media. From the media, there's a recall with regards to certain jars of peanut butter produced are sold by a woman. And so, she looks into it. She had saved the jars for really strange reasons. One, she was going to try to make a mousetrap out of, and I don't understand that one at all, but the other one was to put some detergent in and things like that. So, she pipped the jars, and not for any particular reason other than her reason. And so, when she compared the numbers, she found out, hey, this is the reason I'm having problems. She tells her physician that. He continues to treat her. Her symptoms go from acute to chronic, and they last for approximately a year, until such time as she undergoes a colonoscopy. And after the colonoscopy, she's completely cleaned out. She stops having symptoms. I mean, that's the one thing that she says gave her or created the cure to her illness. So, the doctor's deposition, I would say, from Ms. Johnson's standpoint, could have been a little more better, but it was a discovery. And the doctor, without doubt, states, as Mr. McDonald states in his brief, that he said that it's hard to say whether or not Salmonella could have been her problem. Could have been, could not have been. So, when I'm doing the questioning, I ask him specifically about the causational aspect of it. And he uses the expression, I see this as a cause and effect situation. Meaning, the cause being Salmonella, the effect being the symptoms derived from that. Now, that is a reasonable inference from his language, cause and effect. And, as I understand the case law, when it comes to summary judgment, summary judgment is when everybody kind of agrees that this is the facts, and everybody agrees that somebody should be entitled to judgment because there is no real dispute with regards to the factual scenario. Here, there is a significant dispute between the defendant and the plaintiff, in that the plaintiff says, I ate too bad peanut butter, I got sick. I was sick for almost a year before I finally got well. The defendant, on the other hand, said, hey, we tested your peanut butter, you were subjected to Salmonella, and according to your doctor, it's hard to say whether or not it was or it wasn't. So, to me, if you look at the factual scenario that was presented in the summary judgment, because it's not evident, because evidence only comes in at trial, this is not a trial, and I know you gentlemen understand that, that based on affidavits and sworn testimony and that kind of thing, there's an issue. If you look at the information provided to the court and you look at it in a light most favorable to the plaintiff, because she's the nonbelief party, there is a genuine issue as to whether or not her consumption of peanut butter that was absolutely positively part of her recall for Salmonella was the cause of her symptoms. Let me ask you a question here. She started vomiting two hours after she ate the peanut butter. Right. Okay. When was the stool culture tested? Because it came in negative. How long after was the stool culture? Oh, my gosh, months. Months. How about the colonoscopy? That was about a year later. A year. Okay. So she suffered from her symptoms, and, you know, she had some embarrassing moments where she soiled herself and that kind of thing because of the diarrhea. How soon after she began vomiting did she go to the doctor? See, that's just it. She thought she had the flu. She didn't go until December. She started vomiting in October, and because the vomiting subsided and the diarrhea, you know, was the main problem that she had and the cramping and the nausea, she didn't seek immediate medical attention. And, you know, should she have? Yes, without a doubt. But people don't want to say. I mean, that's just people's nature. It's my nature. Whenever I was poisoned, I never did see a doctor. I just spent a lousy Memorial Day weekend. So, in essence, Your Honors, that's the way I see this, is that she didn't get a fair shake. She should have got a right to have a prior fact-determined causation because there is some causational issues there, and that, without a doubt, she ate peanut butter, ate whole jars of peanut butter that were subject to the report. And it's just not a leap of faith to think that maybe this peanut butter she ate caused her problems, which ultimately subsided once she finally got off the infected. Thank you, Counselor. We have an opportunity for rebuttal. Mr. McDonnell. Good morning. May I please report, Counsel? Mr. Weaver has told the Court in his brief, in the last line, what his case is about. It says, eat peanut butter, get sick. That's all they have. And the bottom line is, he hasn't created a question of fact on the elements that are required to prove a cause of action for a product such as a food substance like peanut butter. You note that there's one case cited by him in his argument. There's no law that he has cited. The issue is laid out pretty well in the Warren v. Coca-Cola case, which we cited in our brief. And that case lays out what the elements are for establishing such a cause of action. And the elements are that you have to prove the product wasn't contaminated, that you have to show that there's a direct injury directly resulting from that contaminated product, and thirdly, that the contamination was caused by the defendant. All three elements. Plaintiff, in this case, has not produced any evidence to create a genuine issue of fact on any of the elements. They haven't proven two out of the three, all three out there. They haven't proven none of them. If you look at the question of, was the product that she purchased contaminated, what we look at and we say, there was actually four jars of peanut butter that she purchased that she claimed was within the recall period. The first jar, she had washed out because she was going to use it for 20 mule team four hours, I guess. I hadn't even heard that one since Ronald Reagan. The second one was for a mousetrap, cleaned out mule peanut butter. The third one, they lost. The fourth one had peanut butter. So they produced the peanut butter and it was tested by the lab. No salmonella in it. None. So they have no evidence that there was any salmonella in any of the peanut butter that she purchased. He wants to suggest that, well, the fact of the recall somehow suggests that it's likely she might have gotten some. Actually, the affidavit that we supplied to the trial court went the other way. And that is that there were 1,200 plaintiffs who had peanut butter, claimed they were sick, came forward. They produced 1,200 samples of peanut butter for testing. Less than 3% of those had any salmonella in them. So the likelihood, if he wants to talk about likelihood, is that 97% chance she didn't have any salmonella in any peanut butter that she had. So the first element, he's got no evidence of it at all. Second element is, did she suffer an injury? In other words, did she have an injury that directly resulted from the ingestion of this contaminated substance? The answer there is that she claims she had salmonella poisoning, salmonellaosis, from salmonella exposure. Now we look at it. She stated and pled and testified in her discovery deposition that at one in the morning she ate these couple peanut butter sandwiches, drank some iced tea. And then within two hours she got sick. The affidavit that we supplied to the court demonstrates that salmonella, a person who is exposed to salmonella and got salmonellaosis, usually it's 12 to 72 hours. It doesn't occur in two hours. It can't because of the process involved. So if you get sick within two hours, it's likely not due to salmonella. In addition, salmonella poisoning, I mean, even including Mr. Weaver's own personal testimony to the court, if that's for testimony to some degree, maybe it is. The point is that it lasts a few days up to a week. Her symptoms, she claims, lasted for, at one point she says a year and three months. So October of 06, then she has this colonoscopy in August of 07, obviously less than a year and three months. And then it sort of disappears. The notion is that her symptoms that she was having a problem with, she claims were the result of salmonella poisoning, lasted too long. It doesn't fit salmonella poisoning. So the injury she claims she suffered from some exposure maybe to salmonella doesn't fit the medical. There is no medical evidence to support that. They cite Dr. Murphy's deposition, and he suggests, well, it's only a discovery deposition. Well, that's what the courts use. Obviously, it's under oath, it's sworn testimony. His sworn testimony is, I can't say. Maybe she did, maybe she didn't. That's not expert testimony sufficient to get him anywhere. Maybe she did, maybe she didn't. I can't say. Would a doctor have said, as you just said, it doesn't start in two hours, it starts 10 to 12 hours, it doesn't start, it doesn't last as long as she claims. Would you have anybody say that? Yeah, absolutely. You're an expert. Yeah, we are. What did their expert, did he respond to that? No. No. No, he didn't respond to that. It was a discovery deposition. He wasn't even their expert. He was just a treating physician. The treating physician said, I don't deal with salmonella poisoning. I don't see it very often. But what he did say is, and Mr. Weaver suggests, well, he asked him a question and he said there's a cause and effect. No, what he was doing was quoting her. She said, I ate it, I got sick. He goes, I don't know. But when I asked him the questions, nailed it down, he said, I can't say. You know, I can't say she did, I can't say she didn't. But then what he did was, he looked and he said, I don't know if she had diarrhea problems before. He looks at the record and he goes, you know, she did have diarrhea problems. She had these problems in 2004 and 2005. She also gave testimony that we've submitted to the court in her discovery responses and request for admission, in which she said that she got it and suffered it as early as May of 2006. Well, that's even before the peanut butter condition came up. All right? So she was having these problems before. She was on about eight or nine different meds. She had it continuously through the period. She has the same symptoms that she's claiming. She has this stool culture in April of 2007. When she's still having the same symptoms, the stool culture comes back negative for salmonella osis. All right? They do the culture on her microscope. Negative. She says she still had the problems all through the summer to August. He did a colonoscopy. In a colonoscopy, if you have damage from salmonella poisoning, the expert testimony we produced to the trial court says you would have these membranes that would show telltale signs of it. Hers was normal. They took a culture from the colonoscopy to see if there was any evidence of salmonella poisoning. There was none. So all of the tests, all of the medical, the criteria that you would supply to see if it did a pattern, wasn't there. Any actual test she did didn't support that she ever had salmonella poisoning. And the symptoms she had and continued to have all through this period, they don't fit any of them. So the point is, the second element is she come forward with evidence sufficient to get herself to a jury. On the second element of whether there was an injury, she doesn't have that either. And the third element is simply that you have to prove, if you can prove contamination, then you must prove that it was the defendant who caused that contamination. The bottom line is she never proved any contamination of any crime, much less that it was in the condition, that same condition, when it left the factory. So the bottom line is, just as in Warren, and Warren case is really illustrative, because in Warren, there's a plaintiff who drank a Coca-Cola that she had just opened, claims she got sick immediately from it, saved the product, it was then tested, and in the testing of that, they found that there was contamination in that product, but it just wasn't a sufficient amount to have caused any disease or illness. So in that Warren case, they suggest you have to be able to demonstrate that there's evidence that this product caused her injury. And it has to be non-speculative. It can't be just, I think it did. And that's what she has. I ate some peanut butter. I had some illness. I think it was the peanut butter. I mean, so she has peanut butter on her bread. She said, I lost the bread. I'm going to sue Wonder Bread. It's the iced tea. I'm going to sue Whippen Tea. I mean, there has to be some evidence, as the courts have suggested, that demonstrate that there was contaminated product, that there was an injury, and it was caused by the defendant. She doesn't have any of those elements. And Judge Harrison, you know, wrote pretty words and analyzed the case appropriately, and he looked at it and he even, you know, put in there basically a blueprint to the plaintiff to say, hey, get me an affidavit. There's no affidavit in the file. They never did supply one. Never asked even for legal court to try to do that. Never did. Never submitted any medical to support the claim. And the reason why they didn't is because they can't. No doctor could suggest that somebody gets sick that soon, that it lasts that long, and there's no contamination of any product that was demonstrated. So for all these reasons, we believe that this Court should affirm Judge Harrison's very carefully drafted order. Thank you, Mr. McDonough. Mr. Weaver, can I have rebuttal? I'm very afraid of the gentleman. Enlisting Mr. McDonough's argument here today, it sounded remarkably to me like a closing argument in a trial, and that's because there is an issue of fact, and we've presented sufficient information to raise an inference that she was poisoned by bad peanut butter, suffered the consequences of it, and a doctor, although it's hard to say because he wasn't there and he didn't get to test the peanut butter, there's a lot of things that didn't happen. I mean, those things we know, because at the time she ate the peanut butter, she had no idea she was eating bad peanut butter. And it's just something that came up later where she got to discover the reason she was having all the symptoms that she was having was because she ate peanut butter that was subject to a recall. Well, gentlemen, you don't recall a safe product. You just don't do that. The expense associated with it is phenomenal. The bean counters eat that. So, there's something wrong with this peanut butter that made it subject to a recall, and it's called Salmonella. And to say that her condition lasted longer than normal, you know, I don't know what difference it makes, but I had another Salmonella case where the woman suffered from the Salmonella poisoning, and it caused another condition to arise that comes from Salmonella, and she struggled with it for years before she was finally able to get on top of it. So, I'm not buying into that. Thank you, counsel. I appreciate your arguments and briefs. The court will take the matter under advisement and render its decision.